**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

SILVIA CABRERA,

      Plaintiff,

v.                                                                                      Civ. No. 19-720 GJF/CG

CITY OF HOBBS, et al.,

        Defendants.

**MEMORANDUM OPINION AND ORDER ON**
**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

THIS MATTER is before the Court upon separate motions for summary judgment by Defendant Officer Joshua Gordon [ECF 64] and Defendants City of Hobbs, Officer Dustin Seay, and Officer Jayson Hoff (collectively "Remaining Defendants") [ECF 68]. The motions are fully briefed. *See* ECFs 77, 93 (response and reply to ECF 64); ECFs 85, 101 (response and reply to ECF 68). The Court heard extensive argument on these motions on January 20, 2021. *See* Tr. of Hr'g [ECF 110]. After thoroughly considering the parties' arguments, and as explained below, the Court will (1) **GRANT** summary judgment as to Count I of Plaintiff's Complaint ("Excessive Force in Violation of the Fourth Amendment against Defendants Gordon, Seay, and Hoff") [ECF 1 at 11-12] and (2) **DECLINE** to exercise supplemental jurisdiction as to Count II of Plaintiff's Complaint ("State Law Tort Claims against All Defendants") [ECF 1 at 12].[1] The Court will thus **DISMISS** the above-captioned cause **WITH PREJUDICE**.

---

[1] Plaintiff inadvertently labeled the second count of her complaint as "Count IV." ECF 1 at 12. As there are only two counts in the Complaint, however, *see* ECF 1 at 11-12, the Court will refer to the second count as "Count II."

## I.  BACKGROUND[2]

On August 10, 2017, a Walmart employee called the Hobbs Police Department to report a shoplifting in progress by two females, who turned out to be Plaintiff's 19-year-old daughter and 16-year-old niece.  ECFs 64/77 at ¶ 1.  While responding, Defendant Gordon learned that the suspects had fled the store and driven away.  *Id.* at  ¶¶ 4-5.  With the assistance of traffic surveillance cameras, law enforcement authorities tracked the suspects to Plaintiff's home.  *Id.* at ¶ 6.  Defendant Gordon arrived seconds after Plaintiff's daughter and niece pulled into the driveway. *Id.* at ¶ 7.  Shortly after Defendant Gordon began his investigation by speaking to these suspects, Plaintiff's adult son arrived at the home.  *Id.* at ¶ 11.  When the son did not comply with officers' commands that he depart the immediate scene and "go wait over there," Defendant Gordon arrested him for "resisting, evading, or obstructing" an officer.  *Id.* at ¶ 14, 55-59; Seay Body Worn Camera ("BWC") 6:39-7:10 [Pl.'s Ex. C]; Gordon BWC 6:47-7:04 [Pl.'s Ex. 1B]. After speaking further with Plaintiff's daughter, niece, and the loss prevention department at Walmart, Defendant Gordon placed Plaintiff's daughter and niece under arrest for shoplifting. ECFs 64/77 at ¶ 18.  In addition, because Plaintiff's daughter had her three-month-old son with her, Defendant Gordon instructed her to contact another adult to take custody of the infant while she was processed for shoplifting.  *Id.*  at ¶ 21.

Plaintiff was on her work shift at a local Pizza Hut when she received a call from her daughter.  ECFs 64/77 at ¶¶ 21-23.[3]  Plaintiff drove home, parked her pickup truck next to the curb

---

[2] The operative facts set forth in this section are (1) affirmatively admitted by the opposing party; (2) not "specifically controverted" by the opposing party, D.N.M.LR-Civ. 56.1(b); and/or (3) taken from the video evidence, with the Court "accept[ing] the version of the facts portrayed in the video, but only to the extent that it 'blatantly contradict[s]' [Plaintiff's] version of events," *Emmett v. Armstrong*, 973 F.3d 1127, 1131 (10th Cir. 2020) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  Any other dispute of fact between the parties not mentioned in this summary is one the Court considers immaterial.

[3] As relevant to this case, Plaintiff was 44 years old, approximately 5'9" tall and 180 pounds, and had a preexisting injury to her right elbow not visible to the naked eye.  *See* ECF 77 at ¶ N; ECFs 64/77 at ¶ 50; 93 at 3 n.5; 93-1 at 4-

in front of her house, immediately exited the truck, quickly walked a few steps towards Defendant Gordon, and began speaking with him.  *See* Seay Body Worn Camera ("BWC") 14:53-15:30; ECFs 64/77 at ¶¶ 24-26.  Defendant Gordon—who had already arrested, handcuffed, and placed in the back of police vehicles both Plaintiff's son and niece and was waiting to do the same with Plaintiff's daughter—explained to Plaintiff that she would now have to take custody of her infant grandson.  Seay BWC 6:30-7:30, 11:00-12:00, 15:10-15:48.

While standing in the street at the edge of Plaintiff's driveway, Defendant Gordon and Plaintiff talked for about another minute and a half.  *Id.* at 15:48-17:26.  During this conversation, Defendant Gordon explained that Plaintiff's daughter was indeed going to jail because she had committed a fourth degree felony[4] and that—even though they were on Plaintiff's property—her son was also going to jail for not following the officers' instructions to walk away from their investigation.  *Id.* at 15:48-16:23.  In emphasizing that being on Plaintiff's property did not preclude her son's arrest, Defendant Gordon told Plaintiff, "If I told you to do something right now and you didn't do it, I'd put you in handcuffs."  *Id.* at 16:23-30.  After discussing the situation for a few more moments, *id.* at 16:30-17:00, Defendant Gordon "instructed Plaintiff to go back to her vehicle and stand back from where he was speaking to her daughter."  ECFs 64/77 at ¶ 30.  In fact, he "instructed [Plaintiff] *several times* to back away from the scene because he could not proceed with his investigation with [Plaintiff's] continued interference."  *Id.* at ¶ 32 (emphasis added).

---

5 (Plaintiff's treating physician, an orthopedic surgeon, discussing her "previous injury with a fracture in the joint" and the resulting "arthritic changes in the elbow"); ECF 110 at 16:12-19, 73:21-74:1 (Plaintiff's counsel conceding that Plaintiff had a preexisting injury to her elbow, that "she didn't tell any of the [Defendants]" about this injury, and that "they didn't have any independent knowledge of [this injury]").

4 Although Plaintiff's daughter was investigated for the fourth degree felony of "contributing to the delinquency of a minor," NM Stat. § 30-6-3; ECF 110 at 10:21-12:21, she ultimately pled guilty to a misdemeanor charge of shoplifting. ECFs 64/77 at ¶ 54; *see also* Hobbs Municipal Code § 9.24.100 (classifying shoplifting as a misdemeanor when the value of the merchandise shoplifted is less than or equal to $500).

Plaintiff refused to obey these orders.[5]  And "[w]hile [Defendant] Gordon was telling her to stop, [Plaintiff] stepped closer to her daughter and went into the yard"—while repeating the phrase "if you're going to arrest me." *Id.* at ¶ 33; Seay BWC 17:15-17:34.[6]

After Plaintiff moved into her yard, she turned and faced Defendant Gordon. *Id.* at 17:26-34.  Defendant Gordon responded by moving toward Plaintiff and attempting to secure and handcuff her.  Seay BWC 17:33-36.  Plaintiff, however, jerked her arm away from Defendant Gordon, quickly stepped backwards as he continued to reach for her arm, turned away from him, and began to flee. *Id.* at 17:35-39.[7]  But just at this moment, Defendant Gordon managed to grab her right arm and prevent her escape. *Id.* at 17:39-41.  During Defendant Gordon's efforts to position Plaintiff's arm behind her back to handcuff her, Plaintiff repeatedly said, "don't touch me" and continued to pull away from, step away from, and turn away from Defendant Gordon. *Id.* at 17:40-50; Gordon BWC 0:00-0:10.[8]  Defendant Gordon, meanwhile, was holding onto Plaintiff's right forearm with both of his hands, was repeatedly telling Plaintiff to "stop" resisting,

---

[5]  At Plaintiff's criminal bench trial in state court, the court found that when "[Defendant] Gordon gave [Plaintiff] several commands to leave the scene" Plaintiff, *inter alia*, (1) "refused to leave the scene;" (2) "continued to further enter the scene in disregard of [Defendant] Gordon's lawful commands;" (3) "acted intentionally when she refused to obey the lawful commands," and (4) "resisted and interfered with Officer Gordon in the lawful discharge of his regular affixed duties."  ECFs 64/77 at ¶¶ 60-64.  Plaintiff was thus found guilty of, *inter alia*, "Resisting, Evading or Obstructing an Officer" under Hobbs Municipal Code § 9.04.080. *Id*; *see also* Hobbs Municipal Code § 1.16.010; NM Stat. § 31-19-1(B) (classifying such an offense as a "petty misdemeanor").  That conviction remains valid, and the Court considers the state court findings to be undisputed facts.

[6] Although not completely intelligible from the recording, it appears that the conversation between Plaintiff and Defendant Gordon was as follows: Plaintiff: "If you're going to arrest me, go ahead;" Defendant Gordon: "I'll arrest you;" Plaintiff: "If you're going to arrest me right now, let's go right now." *Id.* at 17:26-34.  Ultimately, the actual words exchanged between Plaintiff and Defendant Gordon at this point on the recording are not material to the Court's decision.

[7] *See also* ECF 77 at ¶ FF (Plaintiff admitting in her statement of additional material facts that she did "begin to run" when Defendant Gordon "reached … for her arm" (citing Seay BWC 17:33-36)).

[8] Indeed, the video shows that Plaintiff said "don't touch me" at least six times. *See* Seay BWC 17:36-50.

and was attempting to place Plaintiff's right arm behind her back.  Seay BWC 17:40-50; Gordon BWC 0:00-0:10.

For their part, Defendants Seay and Hoff had also run over to assist, with Defendant Seay grabbing Plaintiff's left arm and placing it behind her back, while Defendant Hoff pointed his Taser at Plaintiff, repeatedly telling her to "stop resisting or [she] [would] be tased."  Seay BWC 17:40-50; Gordon BWC 0:00-20; Hoff BWC 0:00-0:14 [Pl.'s Ex. 11]; ECFs 68/85 at ¶¶ 13-15. As Defendant Gordon—unaware of Plaintiff's preexisting right elbow injury, *see supra* note 3— pulled Plaintiff's right arm behind her back, he heard a "pop" noise come from her arm, after which Plaintiff reacted in pain, stating "you broke by arm."  Seay BWC 17:46-57; Gordon BWC 0:06-0:17; ECF 64/77 at ¶ 40.  The video demonstrates that, from the moment Plaintiff initially began her attempt to elude Defendant Gordon until the officers effectively secured her hands behind her back for handcuffing, less than twenty seconds elapsed.  Seay BWC 17:35-17:54.

After the officers finished handcuffing Plaintiff, Defendant Gordon had an ambulance dispatched to the scene.  ECFs 64/77 at ¶ 42.  Officers soon removed the handcuffs from Plaintiff as the medical responders were en route.  *Id.* at ¶ 43.  Medical personnel later determined that Plaintiff suffered a grade one or two elbow sprain from the force Defendant Gordon applied to her arm.  ECFs 64/77 at ¶ 51.[9]

After a bench trial, a Hobbs Municipal Court found Plaintiff guilty of Resisting, Evading, or Obstructing an Officer and Concealing Identity.  *Id.* at ¶ 61.  On appeal, and after a de novo bench trial in which Plaintiff was represented by counsel, a state district judge affirmed the

---

[9] "A Grade 1 sprain is stretching or slight tearing of the ligament with mild tenderness, swelling and stiffness.  A Grade 2 sprain is a more severe sprain, but incomplete tear with moderate pain, swelling and bruising."  *Id.* at ¶ 52 (citing a Cleveland Clinic publication).  For summary judgment purposes, the Court considers Plaintiff to have suffered a grade two sprain.

Municipal Court's judgment.  *Id.* at ¶¶ 62-64.  There is no evidence in the record that the conviction was further appealed.

Plaintiff subsequently filed suit in this Court, claiming that the three officers (1) used excessive force under the Fourth Amendment (Count I) and (2) were liable, along with the City of Hobbs, for various torts under New Mexico law (Count II).  ECF 1 at 11-12.  Defendants have now requested that this Court grant them summary judgment on both claims.  ECFs 64, 68.[10]

## II.  ISSUES

The Court begins by emphasizing that this case does *not* involve a claim of false arrest.  Indeed, at oral argument, Plaintiff's counsel conceded that the Court should presume that Plaintiff's arrest was valid.  *See* ECF 110 at 8:17-9:22.  Consequently, the primary issues raised by the briefing are:

As to Count I: (1) whether Plaintiff has offered evidence sufficient to create genuine disputes of material fact that would enable a reasonable jury to find that Defendants Gordon, Seay, or Hoff used excessive force in the course of lawfully arresting her; and (2) if so, whether Plaintiff has demonstrated that her right to be free of excessive force during handcuffing precipitated by a lawful arrest was "clearly established," as that phrase has been interpreted by the Supreme Court and the Tenth Circuit.  ECFs 64 at 19-22; 68 at 7-12.

As to Count II:  whether the Court should undertake a traditional summary judgment analysis of the state law claims or should instead "decline to exercise supplemental jurisdiction over [these] claim[s]."  28 U.S.C. § 1367(a); *see* ECFs 64 at 25; 68 at 15-16; *Strain v. Regalado*, 977 F.3d 984, 997 (10th Cir. 2020) (observing that "if the federal claims are dismissed before trial

---

[10] Although Defendant Gordon's motion [ECF 64] did not request that the Court grant him summary judgment on Count II, he made such a request at the hearing.  *See* ECF 110 at 5:13-6:18; 66:5-67:17.

… the state claims should be dismissed as well" (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966))).

## III. APPLICABLE LAW

### A. Summary Judgment Standard

The Court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Bond v. City of Tahlequah*, 981 F.3d 808, 814 (10th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit." *Id.* (quoting *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014). And "[a] dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Smothers*, 740 F.3d at 538 (quotation marks omitted)).

"In applying this standard," the Court must "view the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Bond*, 981 F.3d at 815 (quoting *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1155 (10th Cir. 2016)). Consequently, if the record "contains video evidence of the incident in question," the Court will "accept the version of the facts portrayed in the video, but only to the extent that it 'blatantly contradict[s]' the plaintiff's version of events." *Emmett v. Armstrong*, 973 F.3d 1127, 1131 (10th Cir. 2020) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). In addition, "[a]ll material facts set forth in the [motions and responses] will be deemed undisputed unless specifically controverted." D.N.M.LR-Civ. 56.1(b).

### B. Qualified Immunity

Under 42 U.S.C. § 1983, any person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States … to the deprivation of any rights,

privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Nevertheless, in "[b]alancing the purposes of § 1983 against the imperatives of public policy," the Supreme Court has held that "police officers are entitled to a *qualified immunity* protecting them from suit." *Nixon v. Fitzgerald*, 457 U.S. 731, 746 (1982) (emphasis added); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982) (observing that "government officials are entitled to some form of immunity from suits . . . . to shield them from undue interference with their duties and from potentially disabling threats of liability").

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Bond v. City of Tahlequah*, 981 F.3d 808, 815 (10th Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' . . ." *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 744 (2011)). Consequently, "[w]hen a § 1983 defendant asserts qualified immunity, this affirmative defense 'creates a presumption that the defendant is immune from suit.'" *Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020) (brackets omitted) (quoting *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016)).

"When a defendant moves for summary judgment based on qualified immunity . . . . the burden shifts to the plaintiff to show the defendant is not entitled to immunity." *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (quoting *Roska ex rel. Roska v. Sneddon*, 437 F.3d 964, 971 (10th Cir. 2006)). "Thus, at summary judgment, [the Court] must grant qualified immunity

unless the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Id.* at 900-01 (quoting *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014)); *see also Bond*, 981 F.3d at 815 (noting that "[t]he plaintiff must satisfy both prongs to overcome a qualified immunity defense" and that "[the court] may exercise [its] discretion as to which prong to address first" (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009))).

### C.  Excessive Force Under the Fourth Amendment

The question before the Court when assessing the first prong is whether, "[t]aken in the light most favorable to the party asserting the injury, … the facts alleged show the officer's conduct violated a constitutional right."  *Fogarty v. Gallegos*, 523 F.3d 1147, 1155 (10th Cir. 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

#### 1.  General Principles

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures."  U.S. Const. amend. IV (emphasis added).  "[A] free citizen's claim that law enforcement officials used excessive force in the course of making an arrest … or other 'seizure' of [her] person" is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard."  *Graham v. Connor*, 490 U.S. 386, 388 (1989).  Consequently, "[t]o state an excessive force claim under the Fourth Amendment, plaintiff[] must show … that the seizure was unreasonable."  *Bond*, 981 F.3d at 815 (quoting *Thomas v. Durastanti*, 607 F.3d 655, 663 (10th Cir. 2010)).

Whether a seizure was unreasonable, however, is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  *Id.* (quoting

*Graham*, 490 U.S. at 396).  Thus, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* (quoting *Graham*, 490 U.S. at 396-97).    Furthermore, "the 'reasonableness' inquiry in an excessive force case is an *objective* one: the question is whether the officers' actions are '*objectively* reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* (emphasis added) (quoting *Graham*, 490 U.S. at 397).  "This is a 'totality of the circumstances' analysis."  *Id.* at 815-16 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).  Finally, "[w]hen considering 'the facts and circumstances of each particular case,' [the Court] specifically consider[s] three factors outlined by the Supreme Court in *Graham*: (1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether he is actively resisting arrest or attempting to evade arrest by flight.'"  *Id.* at 816 (quoting *Graham*, 490 U.S. at 396).

### 2.  Manner of Handcuffing

"[I]n nearly every situation where an arrest is authorized ... handcuffing is appropriate."  *Mglej v. Gardner*, 974 F.3d 1151, 1166 (10th Cir. 2020) (quoting *Fisher v. City of Las Cruces*, 584 F.3d 888, 896 (10th Cir. 2009)).  Indeed, "the right to make an arrest ... necessarily carries with it the right to use *some* degree of physical coercion or threat thereof to effect it."  *Id.* (emphasis added) (quoting *Graham*, 490 U.S. at 396).  Furthermore, "the Fourth Amendment 'does not require [police] to use the least intrusive means in the course of a detention, only reasonable ones.'"  *Fisher*, 584 F.3d at 894 (quoting *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1222 (10th Cir. 2005)); *see also id.* (observing that "[n]ot every push or shove, even if it may later seem

unnecessary in the peace of a judge's chambers, violates the Fourth Amendment" (quoting *Graham*, 490 U.S. at 396)).  Consequently, "[a]n excessive force claim that includes a challenge to the '[m]anner or course of handcuffing' requires the plaintiff to show both that 'the force used was more than reasonably necessary' and 'some non-de minimis actual injury.'"  *Mglej*, 974 F.3d at 1167 (quoting *Donahue v. Wihongi*, 948 F.3d 1177, 1196 (10th Cir. 2020)).[11]

The Tenth Circuit has held that a reasonable jury could find that the manner of handcuffing was excessive when applied to a non-threatening, cooperative petty misdemeanant who "lay bleeding on the ground," whose "bicep wound had swollen to the size of a grapefruit," and who "pleaded with the officers to avoid exacerbating the injuries"—but who nevertheless was injured when "an officer placed a knee in [his] back to leverage his arms [due to his swollen bicep], and handcuffed him with his arms behind his back."  *Fisher*, 584 F.3d at 892, 895-900.  But the Tenth Circuit "hasten[ed] to add this might [have been] a very different case" if, for example, "the officers had *no knowledge* of [the misdemeanant's] injuries" or "[the misdemeanant] had *refused to cooperate*."  *Id.* at 896 (emphasis added).[12]

In addition, the Tenth Circuit has held that the level of force would be unreasonable if police were to injure a non-threatening, cooperative petty misdemeanant protestor by "hit[ting] [him] with a rifle-fired projectile," "grabb[ing] him, thrust[ing] him to the ground, and forcibly

---

[11] Furthermore, the "non-exclusive" *Graham* factors are "less helpful in evaluating the *degree* of force … [when] the handcuffing is permissible yet the *manner* of handcuffing may render the application of force excessive."  *Fisher*, 584 F.3d at 895-96 (emphasis in original); *see also id.* at 902 n.1 (Gorsuch, J., concurring) (observing that "police officers almost always may use handcuffs in the course of a lawful arrest, regardless of the severity of the crime, the dangerousness of the suspect, or any attempts at flight—*Graham's* three factors" (citation omitted)).  When the handcuffing is permissible, but its manner is contested, "an examination of the resulting injury supplements [a court's] inquiry."  *Id.* at 896-97.

[12] *See also id.* at 901 (observing that "[i]t is long established law of this and other circuits that a triable claim of excessive force exists where a jury could reasonably conclude that the officer handled a *cooperating* arrestee in a manner that the officer *knew* posed a serious risk of exacerbating the arrestee's injuries, which were themselves known to the officer" (emphasis added) (citing cases).

11

escort[ing] him through a cloud of tear gas," and "us[ing] 'an incredible amount of force' to put his wrist into a painful hyperflexion position . . . . from three to five minutes[,] result[ing] in a torn tendon." *Fogarty*, 523 F.3d at 1161; *see also id.* at 1162 (concluding that "it would be apparent to a reasonable officer that the use of force adequate to tear a tendon is unreasonable against a *fully restrained* arrestee" (emphasis added)); *McCowan v. Morales*, 945 F.3d 1276, 1282-84 (10th Cir. 2019) (holding that it would constitute unreasonable force for an officer to place a handcuffed, "fully compliant[,] and subdued misdemeanant arrestee" in the "'caged' back seat of the patrol car"—"unrestrained by a seatbelt"—and then to "[drive] recklessly, knowingly tossing [the arrestee] about the back seat").

### D.  Defining a Clearly Established Right

To establish that an officer "is not entitled to immunity," *Gutierrez*, 841 F.3d at 900, a plaintiff must not only show that "the officers' alleged conduct violated a constitutional right"— but also that "[the] right was clearly established at the time of the violation, such that *every reasonable officer* would have understood that such conduct constituted a violation of that right." *Mglej*, 974 F.3d at 1159 (emphasis added) (quoting *Estate of Smart*, 951 F.3d at 1168). Furthermore, "the clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019).  In fact, the United States Supreme Court has "repeatedly told courts … not to define clearly established law at a high level of generality"—a requirement "[t]hat is particularly important in excessive force cases:"

> Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.  Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent *squarely governs* the specific facts at issue. . . .

> [I]t does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness.  An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that *any reasonable official* in the defendant's shoes would have understood that he was violating it.

*Id.* (emphasis added) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152-53 (2018) (per curiam) (remaining alterations in original)).

"Nonetheless, even in the Fourth Amendment context, there need not be a prior 'case directly on point,' so long as there is existing precedent that places the unconstitutionality of the alleged conduct 'beyond debate.'"  *McCowan*, 945 F.3d at 1285 (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)); *Syling*, 928 F.3d at 1197-98 (same).  For example, the Tenth Circuit "recently held that … there was still sufficient Tenth Circuit case law that 'made it clear to any reasonable officer in the [defendants'] position that the *post-restraint force* [challenged in that case] was unconstitutional.'"  *McCowan*, 945 F.3d at 1285-86 (emphasis added) (quoting *McCoy v. Meyers*, 887 F.3d 1034, 1052 (10th Cir. 2018)).  Specifically, Tenth Circuit case law provides "notice that the *gratuitous* use of force against a *fully compliant*, *restrained*, and *non-threatening* misdemeanant arrestee [is] unconstitutional."  *Id.* at 1287 (citing *McCoy*, 887 F.3d at 1052-53) (observing that it is "clear and well established … that when an officer inflicts *gratuitous* force against a *fully compliant and subdued arrestee* he is not protected by qualified immunity" (emphasis added)).[13]

---

[13] In its articulation of this clearly established law, the court "specifically identified three prior Tenth Circuit cases that, applying the *Graham* factors, 'clearly establish that the Fourth Amendment prohibits the use of force without *legitimate justification*, as when a subject poses no threat or has been subdued.'"  *Id.* (emphasis added) (quoting *McCoy*, 887 F.3d at 1052); *see also id.* at 1287-89 (further discussing (1) *Weigel v. Broad*, 544 F.3d 1143, 1146-49, 1151-53 (10th Cir. 2008), in which the arrestee died of asphyxiation after "officers and bystanders subdued the suspect by handcuffing his arms, tying his legs together, laying on top of his legs, and kneeling on his upper torso . . . . for a significant period of time (several minutes) that [the suspect] was fully restrained and posed no danger;" (2) *Casey v. City of Federal Heights*, 509 F.3d 1278, 1279-83 (10th Cir. 2007), in which "a non-violent misdemeanant suspect who was not resisting, fleeing, or dangerous"—but was merely "on his way back into the courthouse" after "retriev[ing] money from his car to pay his traffic citation"—was "tackle[d], tase[d] and beat … in order to arrest him

13

### E.  Supplemental Jurisdiction

Generally, a district court "shall have supplemental jurisdiction over all other claims that are so related to claims … within [the court's] original jurisdiction that they form part of the same case or controversy."  28 U.S.C. § 1367(a).  Nevertheless, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim … if … the district court has dismissed all claims over which it has original jurisdiction."  § 1367(c).  Consequently, "[a] district court, upon dismissing Plaintiff's federal claims, [does] not abuse its discretion by declining to exercise supplemental jurisdiction over [his] state law claims." *Strain v. Regalado*, 977 F.3d 984, 997 (10th Cir. 2020) (also observing that supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right" (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966))).  In fact, "if the federal claims are dismissed before trial … the state claims *should* be dismissed as well." *Id.* (emphasis added) (quoting *Gibbs*, 383 U.S. at 726).

## IV.  PARTIES' PRIMARY ARGUMENTS

### A.  Excessive Force

Defendant Gordon argues that "[b]ased on the application of the controlling law to the undisputed facts, a reasonable juror could *not* conclude that [Defendant] Gordon used excessive force against [Plaintiff]."  ECFs 64 at 19 (emphasis in original); 93 at 1-4. Defendant Gordon asserts that the Court "must consider the facts and circumstances confronting [him], judging 'reasonableness … from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  ECF 64 at at 20 (quoting *Cavanaugh v. Woods Cross City*, 718 F.3d

---

for the misdemeanor offense of removing a public record—[his] court file—from the courthouse;" and (3) *Dixon v. Richer*, 922 F.2d 1456, 1457-59, 1462-63 (10th Cir. 1991), in which officers "kick[ed] the plaintiff and hit[] him in the stomach with a flashlight, and then chok[ed] and beat[] him"—even though he posed no threat and "[was] not suspect[ed] … of committing a crime, but instead [was] stopped [by officers] … just to ask about another individual").

1244, 1248 (10th Cir. 2013)).  As part of this analysis, Defendant Gordon argues that all three (non-exclusive) *Graham* factors weigh in his favor.  *Id.* at 20-23.  Although Defendant Gordon briefly addresses the first two *Graham* factors (the severity of the crime and whether Plaintiff posed an immediate threat), he primarily argues that "[g]uided by the third *Graham* factor [i.e., whether the suspect is 'actively resisting arrest or attempting to evade arrest by flight'] and considering the totality of the circumstances, the undisputed facts show that Officer Gordon's use of force was proportional and reasonable given the nature of [Plaintiff's] forceful physical resistance."  *Id.* at 20-23 (also asserting that "[w]ithout question, *Graham's* third factor weighs in [Defendant] Gordon's favor regarding the reasonableness of the amount of force used to arrest a person who was actively resisting her lawful arrest").

In response, Plaintiff claims that there are genuine disputes of material fact as to whether Defendant Gordon used excessive force.  ECF 77 at 22-28.  In doing so, Plaintiff first asserts that "[w]hether Defendant Gordon pushed [her] forward by lifting her right arm or whether [she] pulled away is an issue of fact that must be resolved by the jury."  *Id.* at 22-23.  Plaintiff then argues that all three *Graham* factors weigh in her favor and thus show that "[a] reasonable officer in Defendant Gordon's position would know that the force used was unnecessary."  *Id.* at 23-28.  Plaintiff addresses *Graham's* first two factors primarily by emphasizing that Plaintiff's offense was a "petty misdemeanor" and that she posed no "*immediate* threat."  *Id.* at 23-26 (emphasis in original).  In addressing *Graham's* third factor, Plaintiff primarily argues that she could not have evaded or actively resisted arrest because Defendant Gordon "never warned her that she could be arrested and never told her she was under arrest."  *Id.* at 27; *see also* ECF 110 at 19-24, 45.

Defendants Seay and Hoff argue that "[u]nder the objective reasonableness standard applied by the Tenth Circuit, [their] conduct comes nowhere near constituting excessive force."

ECFs 68 at 7-12; 101 at 9-13.  They assert that "[t]he video footage from Officer Seay's lapel camera provides all the evidence needed to prove that Officer Seay's and Hoff's minimal use of force was appropriate."  *Id.* at 10.  Indeed, they contend, "it is hard to imagine a *less forceful* means of securing Plaintiff based on her obstructive and erratic conduct."  *Id.* (emphasis added).  Thus, "[c]onsidering Plaintiff's conduct, the minimal use of force by the [two] Officers was indisputably reasonable."  *Id.* at 11 (also observing that "the Officers were put in a rapidly evolving situation where, in her agitated state, Plaintiff disobeyed [Defendant] Gordon's commands and violated the law, posed a potential threat to Officers and others, and resisted arrest" (citing *Graham's* three factors)).  Finally, they argue that they had no duty to intervene because Defendant Gordon never used excessive force and that, in any event, they would have had no "realistic opportunity to intervene."  *Id.* at 12-14; ECF 101 at 14.

In response, Plaintiff argues that "it would have been clear to a reasonable officer in Defendants Seay's and Hoff's position that the force [they] used against [Plaintiff] was unreasonable."  ECF 85 at 18-21.  Plaintiff reiterates that her crime was a "petty misdemeanor," that she posed no "immediate threat," and that she could not have resisted or fled because "[she] was never told she was under arrest."  *Id.*  Thus, because "all three factors weigh in her favor," Plaintiff concludes that any force beyond essentially "ask[ing] [her] to turn around so she could be placed in handcuffs," as was done with Plaintiff's niece, was excessive.  *Id.* at 21.  Finally, she reasserts her contention that Defendant Gordon used excessive force and then argues that Defendants Seay and Hoff had a "realistic opportunity to intervene," particularly by preempting his use of such force.  *Id.* at 26-29; ECF 110 at 80:7-21.

### B. Clearly Established

Defendant Gordon asserts that "the law was not clearly established that the amount of force used by [him] to place [Plaintiff] in handcuffs is unconstitutional." ECF 64 at 23.   He reasons that there is no "factually analogous Tenth Circuit or Supreme Court case which holds that an officer cannot force a suspect into handcuffs who actively resists a lawful arrest by physically tensing up and moving her arms in an attempt to first prevent and then later escape the officers' escort hold." *Id.*  Defendant Gordon thus concludes that any right to be free from such force was not clearly established. *Id.* at 23-24.

Plaintiff asserts in response that Defendant Gordon violated her clearly established right against excessive force because "a reasonable officer would have known that contorting and twisting a restrained nonviolent petty misdemeanant suspect's arm behind her back until her arm popped and her ligaments were torn violated the Fourth Amendment." ECF 77 at 28-34.  She argues that the Tenth Circuit's holdings in *Fogarty*, 523 F.3d 1147, and *McCowan*, 945 F.3d 1276, would have given a reasonable officer "fair warning" that such conduct was unconstitutional.  ECF 77 at 29-34.  Furthermore, she emphasizes that because, "there will almost never be a previously published opinion involving exactly the same circumstances," the Court must engage in an "all-things-considered inquiry."  ECF 77 at 33 (quoting *Casey*, 509 F.3d at 1284).  "In other words," Plaintiff asserts, the Court must recognize that "general statements of the law can clearly establish a right for qualified immunity purposes if they apply with obvious clarity to the specific conduct in question."  *Id.* at 20-21 (quoting *A.N. ex rel. Ponder v. Syling*, 928 F.3d 1191, 1198 (10th Cir. 2019)); ECF 110 at 68:3-10.  Under such an approach, and in light of *Fogarty* and *McCowan*, Plaintiff concludes that a reasonable officer would have known that the force used by Defendant Gordon was excessive.  ECF 77 at 32-34.

Defendants Seay and Hoff assert that, regarding their applications of force, "there is no case law supporting Plaintiff's allegations that her clearly established rights were violated." ECF 68 at 10-12. They reason that the law "does not state that no force may be used in executing an arrest" or "require an officer to use the least or a less forceful alternative." *Id.* at 10. Instead, they argue, the law only requires that "the use of force must be reasonable." *Id.* They conclude, "[b]ased on the[] indisputable material facts," that "[their] conduct was objectionably reasonable under the totality of the circumstances"—and that they therefore could not have violated Plaintiff's clearly established rights. *Id.* at 11-12. Finally, regarding Plaintiff's failure to intervene claims, Defendants Seay and Hoff simply imply that they could not have violated a clearly established right because they "did not have a realistic opportunity to intervene." *Id.* at 13-14.

In response, Plaintiff argues that—as with Defendant Gordon—Defendants Seay and Hoff also had notice, based on *Fogarty* and *McCowan*, that their conduct "violated [her] clearly established right to be free from excessive force." ECF 85 at 22-25. Lastly, although she contends that Defendants Seay and Hoff had a "realistic opportunity to intervene," particularly by preempting Defendant Gordon's use of force, *id.* at 26-26, she also concedes that no precedent establishes such an affirmative duty to preempt the application of force altogether. *See* ECF 110 at 80:7-21.

## V. ANALYSIS

For the following reasons, the Court holds that Plaintiff has not offered evidence from which a reasonable jury could find that any of the individual defendant officers used excessive force against her. The Court therefore holds as a matter of law that none of the officers violated Plaintiff's right against excessive force and/or unreasonable seizure. In addition, and alternatively, the Court also holds that the right of an uncooperative arrestee to be free of excessive force during

18

the process to restrain and handcuff her was not clearly established under circumstances sufficiently similar to the ones that confronted the officers here.

### A. Defendants Gordon, Seay, and Hoff Did Not Use Excessive Force

#### 1. Defendant Gordon Did Not Use Excessive Force

In response to Defendant Gordon's motion for summary judgment based on qualified immunity, Plaintiff asserts that she has satisfied "[her] burden … to show [Defendant Gordon] is not entitled to immunity," *Gutierrez*, 841 F.3d at 900.  ECF 77 at 22-35.  In specifically addressing whether a constitutional right was violated, Plaintiff argues that there are genuine disputes of material fact as to whether "[Defendant Gordon's] use of force was reasonable."  ECF 77 at 22-28.  The Court, however, holds that the evidence proffered by Plaintiff would not permit a reasonable jury to find that Defendant Gordon used unreasonable (or excessive) force in handcuffing Plaintiff.  *Gutierrez*, 841 F.3d at 900-01.

The Court's analysis begins "from the perspective of a reasonable officer on the scene," viewing the evidence (and the reasonable inferences therefrom) in the light most favorable to Plaintiff.  *Bond*, 981 F.3d at 814-15 (quoting *Graham*, 490 U.S. at 396).  From such a perspective, a "reasonable officer on the scene" would have clearly observed that—during his efforts to ensure Plaintiff's son and niece were taken to jail and properly processed for misdemeanor offenses, Plaintiff's daughter was taken to jail and properly processed for a fourth degree felony, and Plaintiff's grandson was properly placed in an appropriate caregiver's custody—Plaintiff was uncooperative.  Specifically, such an officer would have observed that Plaintiff (1) disobeyed his *repeated* lawful commands to leave the scene, (2) entered the scene in direct defiance of his lawful commands, (3) began to *run away* to avoid his initial attempt to handcuff her, and (4) continued to *actively resist* his efforts, upon his catching her by the right arm, to place that arm behind her back.

*See* ECFs 64/77 at ¶¶ 30, 32-33, 60-64; 77 at ¶ FF; Seay BWC 17:15-17:50; Gordon BWC 0:00-0:10.  Furthermore, in the "tense, uncertain, and rapidly evolving" *thirteen seconds* between the time Plaintiff started fleeing and her elbow getting sprained, *see* Seay BWC 17:36-49, any reasonable officer would have been "forced to make split-second judgments … about the amount of force that [was] necessary"—and would have had no reason to suspect that Plaintiff had a preexisting elbow injury.  *Bond*, 981 F.3d at 815 (quoting *Graham*, 490 U.S. at 396-97).

In assessing the "totality of the circumstances" from this perspective, the Court finds that the force used by Defendant Gordon to handcuff Plaintiff was, regardless of his "underlying intent or motivation," "objectively reasonable."  *Bond*, 981 F.3d at 815-16 (quoting *Graham*, 490 U.S. at 397; *Garner*, 471 U.S. at 8-9).  Although the "severity of [Plaintiff's] crime" and the "immediate threat" she posed, *Graham*, 490 U.S. at 396, were not extreme, neither was Defendant Gordon's choice to handcuff Plaintiff as part of an arrest that Plaintiff has conceded was valid.  Indeed, the question before the Court is not whether Defendant Gordon was permitted to handcuff Plaintiff at all—but rather whether "the *manner* of handcuffing" had "render[ed] the application of force excessive."  *Fisher*, 584 F.3d at 896 (emphasis in original); *see also* ECF 110 at 9:8-22, 33:9-16 (Plaintiff acknowledging that Defendant Gordon had probable cause to arrest Plaintiff for a petty misdemeanor and affirming that her Count I claim against Defendant Gordon turned on whether "[he] used excessive force in *effecting* that arrest" (emphasis added)).  And the manner in which Defendant Gordon handcuffed Plaintiff was "reasonable and proportionate given [her] resistance," *Perea*, 817 F.3d at 1203—which consisted not only of her "attempt[] to evade arrest by flight" when Defendant Gordon initially tried to place her in handcuffs, but also her continued efforts to

"actively resist[] arrest"[14] when he caught her right arm and tried to place it behind her back. *Graham*, 490 U.S. at 396.

Plaintiff does not contest the "C-clamp" technique[15] used by Defendant Gordon to handcuff her, but she does contest "the amount of force that Defendant Gordon used to execute that technique." ECF 110 at 74:12-23; 73:7-12. Specifically, she contends that a reasonable jury could find that, while she perhaps "initially mov[ed] away from Defendant Gordon when he grabbed her," ECF 77 at 28, (1) any such resistance would have stopped before Defendant Gordon began placing her arm behind her back, ECF 77 at 22-23, 28; (2) Defendant Gordon "knew or should have known," *Bond*, 981 F.3d at 815-16, that such resistance had stopped, at least at some point before her elbow was sprained, *see* ECF 77 at 23, 28; and (3) Defendant Gordon used unreasonable force while she was no longer resisting, as evidenced by her leaning forward and bending over while he placed her arm behind her back, *see* ECFs 77 at 23 (asserting that "[w]hether Defendant Gordon pushed [Plaintiff] forward by lifting her right arm or whether [Plaintiff] pulled away is an

---

[14] Plaintiff argues that she could neither have evaded nor actively resisted arrest because Defendant Gordon "never warned her that she could be arrested and never told her she was under arrest." ECF 77 at 27; *see also* ECF 110 at 19-24, 45. As a factual matter, however, it seems clear that Plaintiff *was* warned that she could be arrested. *See* Seay BWC 16:23-30 ("If I told you to do something right now and you didn't do it, I'd put you in handcuffs."), 17:26-29 ("I'll arrest you."). Furthermore, Plaintiff cites no authority—and the Court is aware of none—suggesting that a nonviolent petty misdemeanant cannot evade or resist arrest unless he or she is somehow first "given notice … that [the officer] intends to arrest [him or her]." ECF 110 at 19-20 (Plaintiff later characterizing such a notice as "the preferred method"). The authorities cited by Plaintiff, *see* ECF 77 at 27, merely support the proposition that an officer should not Tase—or "tackle[], Tase[], and beat[]," *Casey*, 509 F.3d at 1279—someone who, for example, is a "nonviolent misdemeanant who [does] not pose a threat and [is] not resisting or evading arrest without first giving a warning," *Cavanaugh v Woods Cross City*, (10th Cir. 2010) (discussing *Casey*, 509 F.3d 1278)). But requiring a warning before commencing a beating or a tasing upon a nonviolent misdemeanant is worlds apart from establishing that such a misdemeanant can only be considered as resisting arrest if he or she was first given notice about the arrest. In any event, in the absence of any Supreme Court or published Tenth Circuit authority requiring an officer to verbally advise an arrestee that she is about to be arrested (or is now under arrest), the Court is unwilling to be the first to announce such a right.

[15] Defendant Gordon's counsel described this C-clamp procedure as an "escort hold" (although he conceded that there is no evidence in the record that it is considered as such and not as a "pain compliance technique"); but—regardless of how the procedure is characterized—Plaintiff concedes that there is no evidence in the record that Defendant Gordon ever injured someone with this procedure. *See* ECF 110 at 17:9-18:3, 55:23-24, 62:18-65:16, 72:4-10.

issue of fact that must be resolved by the jury"); 110 at 74:12-23 (Plaintiff describing Defendant Gordon as "lift[ing] [Plaintiff's] arm up behind her head … essentially pushing her forward"); *see also* Seay BWC 17:45-50; Gordon BWC 0:05-0:10.

Despite such contentions, the Court concludes that Plaintiff has not met her burden to establish that a reasonable jury could find that "the force used was more than reasonably necessary." *Mglej*, 974 F.3d at 1167.  For instance, Plaintiff has not presented any evidence suggesting that the manner in which Defendant Gordon sought to restrain Plaintiff, position her arms behind her back, and then handcuff her was somehow inconsistent with basic police training or general police practice.  Neither has she presented any evidence that Defendant Gordon ever injured any other person such that he would have been on notice of the potential dangers of these techniques.  Furthermore, Defendant Gordon used only his hands to grab Plaintiff's arm and position it behind her back so that he could handcuff her.  He did not, for example, tackle her, punch her, inflict any elbow or knee strikes, use any chokehold, or take her to the ground.  Nor did he use any of the equipment available to him, whether it be baton, pepper-spray, Taser, or firearm. Putting aside the question of whether Defendant Gordon *should* have arrested Plaintiff at all, or whether a more seasoned or patient officer would have done so, the evidence before the Court – even when viewed in the light most favorable to Plaintiff – demonstrates as a matter of law that Defendant Gordon used a reasonable amount of force to effect the arrest of someone intent on preventing it.

The Court also finds Plaintiff's assertion that she essentially stopped resisting once Defendant Gordon grabbed her to be "blatantly contradict[ed]," *Scott v. Harris*, 550 U.S. at 380, by the video evidence.  That evidence unequivocally shows that, after disobeying Defendant Gordon's repeated lawful commands, Plaintiff ran away to avoid his initial attempt to handcuff

her, and then, during his efforts to move her arm behind her back, repeatedly stated "don't touch me," pulled away, stepped away, and turned away from Defendant Gordon. *See* Seay BWC 17:35-50; Gordon BWC 0:00-0:10. In addition, even if—and contrary to the video evidence—Plaintiff stopped resisting the instant before her elbow sprain, the Court finds that Defendant Gordon neither "knew [nor] should have known" about any such imperceptible, latent compliance (or, for that matter, a preexisting right elbow injury) during the "tense, uncertain, and rapidly evolving" moments leading up to her being handcuffed. *Bond*, 981 F.3d at 815-16; *see also Saucier*, 533 U.S. at 205 (observing that "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed"); *Fisher*, 584 F.3d at 894 (observing that police are not required to use "the least intrusive means in the course of a detention, only reasonable ones"); ECF 110 at 25:18-15, 27:14-28:1 (Plaintiff conceding that, from the required objective perspective of a reasonable officer on scene, someone in Defendant Gordon's position "doesn't have to be a scientist and apply exactly one percent more force than a person is putting up in resistance").[16] Thus, even if the force used by Defendant Gordon did cause Plaintiff to lean forward and bend over, the force was nonetheless "reasonable and proportionate given [her] resistance," *Perea*, 817 F.3d at 1203, particularly when viewed "from the perspective of a reasonable officer on the scene." *Bond*, 981 F.3d at 815.

---

[16] Plaintiff's counsel made this concession in response to the following question by the Court, "So -- so you and I agree -- after going through those hypotheticals, you and I agree that through those hypotheticals, you and I agree that an officer can -- can use force, under certain circumstances, to reduce a person to custody and to overcome whatever -- whatever resistance that person puts up, so long as the force that the officer uses to overcome the resistance is commensurate to it. I mean, he doesn't have to -- he doesn't have to be a scientist and apply exactly one percent more force than a person is putting up in resistance. But he -- but he doesn't have carte blanche to do whatever he wants. We agree on that, right?" *Id.* Counsel responded with "we do, Judge." *Id.*

In sum, viewing the evidentiary record before it in the light most favorable to Plaintiff, the Court holds that a reasonable jury could not find that Defendant Gordon used unreasonable or excessive force in handcuffing Plaintiff.[17]

### 2.   Defendants Seay and Hoff Did Not Use Excessive Force or Fail to Intervene

In attempting to show that Defendants Seay and Hoff are not entitled to immunity, Plaintiff argues that they each (1) used excessive force and (2) also failed to prevent Defendant Gordon from using excessive force.  ECF 85 at 18-29.  The Court disagrees.

As to Defendant Seay, Plaintiff asserts that the act of grabbing her left arm to assist Defendant Gordon in handcuffing her was "unreasonable and constituted excessive force."  ECF 85 at 22-25; *see also* ECF 110 at 78:15-19 (arguing that any reasonable officer in Defendant Seay's position "should not have touched [Plaintiff] at all").  The Court, however, holds that such minimal force—i.e., grabbing Plaintiff's left arm and wrist, neither of which suffered any injury—was "reasonable and proportionate given [her] resistance."  *Perea*, 817 F.3d at 1203.  Indeed, no reasonable jury could conclude that such force was "more than reasonably necessary," *Mglej*, 974 F.3d at 1167, particularly in light of Plaintiff's attempt to run away from and actively resist Defendant Gordon in his efforts to lawfully arrest her by placing her in handcuffs.  *See* Seay BWC 17:35-17:55; Gordon BWC 0:00-0:20.  And as Plaintiff concedes, Defendant Seay is not required to assess his level of force with scientific or mathematical precision, as the law does not require him to use the "least intrusive means" possible—"only reasonable ones."  *Fisher*, 584 F.3d at 894; *supra* note 16.

---

[17] In a prefatory clause at the end of her reply brief, Plaintiff suggests—without any explanation or supporting argument—that Defendant Gordon somehow "waived" in his motion his ability to argue the first prong of the qualified immunity analysis (i.e., whether he violated Plaintiff's right to be free of excessive force).  *See* ECFs 77 at 34; 110 at 31:6-8.  The Court sees it differently.  Far from waiving the argument, Defendant Gordon led with it and devoted several pages to it.  *See* ECF 64 at 19-23 (Defendant Gordon arguing that "a reasonable juror could *not* conclude that Officer Gordon used excessive force against [Plaintiff]" (emphasis in original)).

As to Defendant Hoff, Plaintiff asserts that, by pointing his Taser at Plaintiff and warning her to "stop resisting or [she] [would] be tased," Hoff BWC 0:00-0:20; Gordon BWC 0:00-20; ECFs 68/85 at ¶ 15, he also used excessive force—even though he never deployed his Taser or touched her in any way.  ECF 85 at 24-25.  The Court, however, holds that any such "force" was also reasonable and proportionate given Plaintiff's active resistance to Defendant Gordon's efforts to place her in handcuffs.  In arguing that such force was excessive, Plaintiff cites cases in which non-threatening individuals were *actually tased* even though they were not resisting or had been effectively subdued, *see* ECF 85 at 24 (citing *Perea*, 817 F.3d at 1204; *Cavanaugh*, 625 F.3d at 665; *Casey*, 509 F.3d 1283), and a case in which officers held non-threatening, compliant individuals (including young children) "at gunpoint … forcing several of them to lie down on the ground for ten to fifteen minutes," *see id.* (citing *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1192–93 (10th Cir. 2001)).  But while it "may be excessive" to actually tase such individuals—or to "continue to aim a *loaded firearm* directly at [them]" *after* they have "*submitted* to the officers' show of force *without resistance*," *Holland*, 268 F.3d at 1193 (emphasis added)— Defendant Hoff never tased Plaintiff nor aimed a loaded firearm at her, and Plaintiff had not "submitted … without resistance."  Furthermore, he ceased threatening to tase Plaintiff when it was clear that she had been subdued.  *See* Hoff BWC 0:00-20.

Finally, "[i]n order to be liable for failure to intervene, [Defendants Seay and Hoff] must have 'observe[d] or ha[d] reason to know' of a constitutional violation and have had a 'realistic opportunity to intervene.'"  *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015) (quoting *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008)).  The Court must thus grant summary judgment in the officers' favor on Plaintiff's failure to intervene claim if either (1) there is no "genuine issue of material fact as to an underlying constitutional violation," *id.* (citations omitted),

or (2) "a reasonable jury could not possibly conclude" that "there [was] a realistic opportunity to intervene," *Vondrak*, 535 F.3d at 1210 (quotation omitted).   As explained above in Section IV(A)(1), there is no genuine dispute of material fact as to the underlying constitutional issue of whether Defendant Gordon used excessive force.[18]   The Court will thus grant summary judgment in his fellow officers' favor on Plaintiff's failure to intervene claim.

In sum, the Court holds that the evidentiary record before it would not permit a reasonable jury to find that Defendants Seay or Hoff (1) used excessive force in assisting Defendant Gordon with handcuffing Plaintiff or (2) failed to prevent Defendant Gordon from using excessive force.

**B.   Even if the Force Was Excessive, No Clearly Established Right Was Violated**

In seeking to satisfy her "burden … to show [Defendants] [are] not entitled to immunity," Plaintiff also seeks to show that Defendants Gordon, Seay, and Hoff's alleged use of excessive force violated a constitutional right that was "*clearly established* at the time of [Defendants'] conduct," *Gutierrez*, 841 F.3d at 900-01 (emphasis added).   ECFs 77 at 28-34; 85 at 22-29.   Even assuming that one or more of the Defendants used excessive force, the Court holds that such conduct did not violate a clearly established right.

Plaintiff argues that Defendant Gordon's conduct violated a clearly established right because "the explicit holdings in *Fogarty* and *McCowan* … provide[d] a reasonable officer fair

---

[18] Furthermore—even if there were such a genuine factual dispute—the Court holds that a reasonable jury could not find that Defendant Seay or Hoff had a "realistic opportunity to intervene to prevent the harm from occurring." *Vondrak*, 535 F.3d at 1210.   Indeed, by the time either officer would have observed Defendant Gordon apply the force that led to Plaintiff's right elbow sprain (or had reason to know of such force), any "realistic opportunity" to prevent this sprain had passed, as the force and the injury essentially occurred simultaneously.   *See also* Seay BWC 17:45-48 (showing approximately three seconds elapsing between (1) Defendant Seay arriving, grabbing Plaintiff's left arm, and beginning to place it behind her back and (2) Defendant Gordon applying the force that instantly sprained her right elbow); Hoff BWC 0:00-0:10 (Defendant Hoff not arriving until *after* Plaintiff's arm was injured); *cf. Fogarty*, F.3d at 1164 (upholding a denial of qualified immunity on a failure to intervene claim when the arrest "last[ed] between *three and five minutes*" (emphasis added) (citing, *inter alia*, *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) (holding that defendant had no duty to intervene when "three blows were struck in such rapid succession that [the defendant] had no realistic opportunity to attempt to prevent them")).   This case did not involve the kind of prolonged, malicious, and often gratuitous application of force the failure-to-intervene doctrine is designed to deter.

warning that lifting a nonviolent misdemeanant suspect's arm behind her back until her ligaments tore was unconstitutional."   ECF 77 at 28-34; *see also* ECF 110 at 43:7-15 (Plaintiff also suggesting that it was "beyond debate" that even grabbing Plaintiff's arm was unconstitutional). As Plaintiff acknowledges, the Court must determine whether "existing precedent" had "made it clear to any reasonable officer in [Defendant Gordon's] position" that alleged excessive force was unconstitutional—i.e., whether the "existing precedent [had] place[d] the unconstitutionality of the alleged conduct beyond debate." *McCowan*, 945 F.3d at 1285-86; *see* ECF 110 at 28:2-17.[19]

In reviewing the existing precedent, however, the Court holds that the force Defendant Gordon applied to Plaintiff's arm was not conduct that "every reasonable officer," *Mglej*, 974 F.3d at 115, would have understood to constitute excessive force.   For instance, although *Fogarty* concluded that "it would be apparent to a reasonable officer that the use of force adequate to tear a tendon is unreasonable against a *fully* restrained arrestee," 523 F.3d at 1162 (emphasis added), Plaintiff was not fully restrained when Defendant Gordon applied the force that sprained her elbow.   Instead, Plaintiff was *in the process* of being fully restrained during her attempt to flee and actively resist being handcuffed.   Moreover, assuming that she had somehow imperceptibly stopped resisting the very instant before her elbow sprain, she was at most only partially restrained when the force was applied.   *See* Seay BWC 17:35-17:50; Gordon BWC 0:00-0:10; *cf. Fogarty*, 523 F.3d at 1160-61 (observing that the non-threatening arrestee, who never "resisted arrest or attempted to evade arrest," had his wrists "put … into a painful hyperflexion position . . . . from

---

[19] To the extent that Plaintiff urges this Court to rely on *Syling*, 928 F.3d 1191, instead of *McCowan*, 945 F.3d 1276, *see* ECF 110 at 69:11-70:18, the Court finds *McCowan*'s teachings more instructive because *McCowan* is both more recent and involved qualified immunity in the excessive force context.   Although *McCowan* was decided over two years after the August 2017 arrest in this case, *McCowan* discussed the "clearly established law at the time relevant to th[e] [*McCowan*] case—August 2015."   *McCowan*, 945 F.3d at 1287.   Thus, although the *McCowan* decision itself cannot factor into whether the right against excessive force in the initial handcuffing context was clearly established in August 2017, *McCowan* is still instructive to the extent it discusses Tenth Circuit decisions that predated Plaintiff's arrest here.

three to five minutes"). In addition, although *McCowan* concluded that any reasonable officer would have found certain "post-restraint force"—i.e., the "*gratuitous* use of force against a *fully compliant*, *restrained*, and *non-threatening* misdemeanant arrestee"—unconstitutional, the force that Defendant Gordon applied (i.e., grabbing her right arm and placing it behind her back despite Plaintiff's resistance) was nothing close to gratuitous "post-restraint" force against a "fully compliant, restrained [or 'subdued'], and non-threatening" individual. *McCowan*, 945 F.3d at 1285-87; *see* Seay BWC 17:35-17:50; Gordon BWC 0:00-0:10.

Reduced to its essence, the rule of law that an objective officer would have derived from *Fogarty* and the cases cited in *McCowan* is this: the continued application of force sufficient to cause bodily injury to an already-handcuffed and non-resisting arrestee is excessive under the Fourth Amendment. *See Fogarty*, 523 F.3d at 1161-62; *McCowan*, 945 F.3d at 1282-84; *see also also supra* Section III(C)(1) (observing that in *Fogarty* the officers forced "[the arrestee's] wrist into a painful hyperflexion position" for "three to five minutes," 523 F.3d at 1161, and in *McCowan* the officer "drove recklessly, knowingly tossing [the handcuffed arrestee] about the back seat" while the arrestee was "unrestrained by a seatbelt," 945 F.3d at 1282). These cases would not have put "any reasonable official in [Defendant Gordon's] shoes," *Emmons*, 139 S. Ct. at 503, on notice that using only his hands to apprehend, restrain, and handcuff a resisting arrestee would also violate the Fourth Amendment. In other words, "there is [no] existing precedent that places the unconstitutionality of the alleged conduct beyond debate." *McCowan*, 945 F.3d at 1285.

Regarding Defendants Seay and Hoff, Plaintiff similarly asserts that they "had notice based on … *Fogarty*, 523 F.3d at 1162, and *McCowan*, 945 F.3d at 1283-84, that their conduct violated [Plaintiff's] clearly established right to be free from excessive force." ECF 85 at 22. As just explained, however, the clearly established principles set forth in *Fogarty* and *McCowan* involve

already-handcuffed arrestees (as opposed to someone still fleeing from or resisting arrest) who were "*fully* compliant, restrained, and non-threatening." *McCowan*, 945 F.3d at 1285-86 (emphasis added); *Fogarty*, 523 F.3d at 1160-62 (same). Furthermore, the Court is unaware of—and Plaintiff has failed to identify—*any* precedent that would have made it clear to "any reasonable officer" in Defendant Seay's position that grabbing Plaintiff's left arm to assist Defendant Gordon was unconstitutional, particularly when Plaintiff suffered no injury to her left arm. *McCowan*, 945 F.3d at 1285; *see* ECF 85 at 22-23.

Similarly, although tasing a non-threatening, non-resisting individual, *Cavanaugh*, 625 F.3d at 665, or continuing to aim a loaded firearm at someone who had "submitted … without resistance," *Holland*, 268 F.3d at 1193 (emphasis added), may be excessive, the Court is unaware of—and Plaintiff has failed to identify—any precedent that would have made it clear to any reasonable officer in Defendant Hoff's position that merely threatening to tase a suspect unless she stopped resisting was unconstitutional, particularly when Defendant Hoff re-holstered the Taser as soon as Plaintiff was restrained. *McCowan*, 945 F.3d at 1285-86; *see* ECF 85 at 24-25. Finally, Plaintiff points the Court to no authority, and the Court is again aware of none, suggesting that either Defendant Seay or Hoff had a constitutional duty to intervene (or preempt[20]) that was "beyond debate." *McCowan*, 945 F.3d at 1285; *see* ECF 85 at 26-29. The Court thus concludes that Defendants Seay and Hoff's use or threat of force, and their conduct in not intervening in (or preempting) Defendant Gordon's use of force, are not actions that any reasonable officer would have understood to be unconstitutional.

---

[20] Although Plaintiff suggested that there existed a duty to "*preempt* … the application of force *at all*," she also conceded that there is no precedent requiring such a preemption. ECF 110 at 80:7-21 (emphasis added).

In sum, the Court holds that no clearly established constitutional right was violated by Defendants Gordon, Seay, or Hoff.

### C.  The Court Should Decline Supplemental Jurisdiction over Count II

Defendants Seay, Hoff, and City of Hobbs formally sought summary judgment on Plaintiff's state law claims (Count II), *see* ECF 68 at 15-17, and Defendant Gordon orally moved at the hearing that the Court also grant him summary judgment on Count II, *see* ECF 110 at 5:13-6:18; 66:5-67:17.  Although Defendants did not formally brief the threshold issue of whether the Court should "decline to exercise supplemental jurisdiction" over Count II, 28 U.S.C. § 1367(c), they encouraged the Court at the hearing to exercise such jurisdiction if the Court were to grant summary judgment on Plaintiff's federal claim (Count I).  *See* ECF 110 at 95:13-96:21.  Plaintiff, however, expressed her preference that the Court decline supplemental jurisdiction if Count I is dismissed.  *See* ECF 110 at 100:21-101:13.  Although the Court appreciates the impact on judicial economy and the additional expense of possible continued litigation, the Court considers itself bound by the Tenth Circuit's strong preference that "if the federal claims are dismissed before trial … the state claims should be dismissed as well."  *Strain*, 977 F.3d at 997.  Consequently, the Court will decline to exercise supplemental jurisdiction over Count II.[21]

## VI.  CONCLUSION

For the foregoing reasons, the Court holds that (1) a reasonable jury could not find that Defendants Gordon, Seay, or Hoff used excessive force; (2) no clearly established constitutional right was violated by Defendants Gordon, Seay, or Hoff; and (3) the Court should decline to exercise supplemental jurisdiction over Count II.

---

[21] Whether the Court's finding that the officers did not use excessive force has any estoppel or preclusive effect on the validity of the state claims is a question this Court has no occasion to answer.

**IT IS THEREFORE ORDERED** that Defendant Gordon's motion for summary judgment [ECF 64] is **GRANTED**.

**IT IS FURTHER ORDERED** that Remaining Defendants' motion for summary judgment [ECF 68] is **GRANTED IN PART AND DENIED IN PART**, as follows:

(1) Count I of Plaintiff's Complaint ("Excessive Force in Violation of the Fourth Amendment against Defendants Gordon, Seay, and Hoff") [ECF 1 at 11-12] is **DISMISSED WITH PREJUDICE**.

(2) Count II of Plaintiff's Complaint ("State Law Tort Claims against All Defendants") [ECF 1 at 12] is **DISMISSED WITHOUT PREJUDICE** because the Court **DECLINES** supplemental jurisdiction as to Count II. Consequently, Remaining Defendants' request that the Court grant summary judgment on Count II [ECF 68 at 15-17], and Defendant Gordon's verbal request at the hearing for the same relief [ECF 110 at 5:13-6:18; 66:5-67:17], are **DENIED**.[22]

**IT IS FINALLY ORDERED** that the above-captioned cause is **DISMISSED WITH PREJUDICE**.

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***

---

[22] Defendant Gordon and Remaining Defendants request that the Court respectively award them "attorney's fees and costs," ECF 64 at 25, and "taxable costs incurred," ECF 68 at 16. The Court, however, declines to address such requests at this time—as such requests must be made "within thirty (30) days *after* entry of judgment." D.N.M.LR-Civ. 54.1, 54.5 (emphasis added) (also requiring such request to be made by motion and in compliance with D.N.M.LR-Civ. 7); *see also* Fed. R. Civ. P. 54(d) (1) (establishing that "costs—other than attorney's fees—should [generally] be allowed to the prevailing party"); Form AO 133, Bill of Costs (District Court), December 2009, available at https://www.uscourts.gov/services-forms/forms (providing an itemized lists of potential costs outside of attorney's fees); *Fox v. Vice*, 563 U.S. 826, 832-36 (2011) (observing that "42 U.S.C. § 1988, allows the award of a reasonable attorney's fee" to prevailing defendants in § 1983 suits—but only if "the plaintiff's action was frivolous, unreasonable, or without foundation" and the requested fees were "incurred because of, but only because of, a frivolous claim" (internal quotations omitted)).